IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| WENDY FONG,<br><br>                    Petitioner,<br><br>vs.<br><br>MICHAEL PALLARES, Acting Warden,<br>Central California Women's Facility,<br><br>                    Respondent. | No. 2:20-cv-00857-JKS<br><br>MEMORANDUM DECISION |

Wendy Fong, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  Fong is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at Central California Women's Facility.  Respondent has answered, and Fong has not replied

## I.  BACKGROUND/PRIOR PROCEEDINGS

On July 16, 2013, Fong, along with co-defendants Robert Haven and Andrew Jeffries, were charged with various crimes, including the first-degree murder of Tony Ortega.  According to the prosecution's theory of the case, Jeffries and/or Haven shot Ortega in the back and head after they lured him to a secluded location under the pretense that they were going to steal a car together.  Trial evidence and testimony also implicated Fong, who was Jeffries' wife, in the plot to kill Ortega.  On direct appeal of her conviction, the California Court of Appeals recounted the following facts underlying the charges against Fong and the evidence presented at trial:

### The People's Case

Amy Quillen and Jeffries had two children together.  Quillen testified that, shortly after her oldest child was born, she and Jeffries began selling methamphetamine.[FN3]  A supplier named Bianca would drop off one to two ounces of methamphetamine every week or two.

FN3.   Quillen testified under a grant of immunity.

According to Quillen, her relationship with Jeffries "had its ups and downs," and there were times when he was abusive.  In 2007, Jeffries beat Quillen, punched her legs and back, head-butted her, and dragged her by her hair.  Quillen sustained bruises on her leg and back.  Jeffries also threatened Quillen with a gun.  Quillen contacted the police, and officers arrested Jeffries.  Police officers photographed Quillen's injuries, and the photographs were admitted at trial.  Quillen and Jeffries separated and reconciled several times.  Eventually, they moved into an apartment at 2687 Altos Avenue, where they continued to sell methamphetamine.

In 2011, Jeffries informed Quillen that he had discovered that he and Fong-Jeffries had a daughter together.  Quillen suspected that Jeffries and Fong-Jeffries were renewing their relationship.  Quillen left Jeffries, and a custody battle ensued.  Quillen again reconciled and moved back in with Jeffries.

At some point after Quillen moved back in, she observed that there were guns in the apartment.  She recalled seeing a silver .357-caliber handgun with a wooden handle which had initials carved into it.  Quillen also recalled seeing a longer black gun with a banana clip in the apartment.

At some point, various people began living with Jeffries and Quillen.  First, Theresa Wilkey and Tony Ortega, methamphetamine users Quillen met through Jeffries, moved into the apartment.  Jeffries and Quillen supplied Ortega and Wilkey with methamphetamine.  Later, Thad Curtis and Granvil Smith lived in the apartment.

By the end of 2011, Quillen's relationship with Jeffries was "terrible."  Beginning on or about January 4, 2012,[FN4] Quillen secretly developed a closer relationship with Ortega.  They became intimate.

FN4.   Unless otherwise noted, all dates are in the year 2012.

Sometime between January and February, Quillen learned that Jeffries was aware of her relationship with Ortega.  Jeffries called Quillen and said, "you're dead, bitch," and then hung up.  Later, Jeffries came home, burst through the door, and immediately started hitting Quillen, who was sitting on the couch with her youngest son on her lap.  Wilkey took the boy to another room while Jeffries continued to strike Quillen.  Jeffries stood Quillen up and told her that they were going to talk to Ortega.  Jeffries drove Quillen to a field, and, during the drive, he told her that, if it was true, he was going to shoot her "execution style."  He told her that he had a gun underneath the car seat.

When they arrived and got out of the vehicle, Ortega was standing in the middle of the field.  Ortega yelled, "[I]t's true, it's true, I'm not lying, I'm not lying."  Jeffries turned around, walked to the truck, and began to drive away.  Quillen told Ortega to tell Jeffries that he was "whacked out or something . . ." because Jeffries was going to kill them.  Ortega flagged Jeffries down as he was driving away and told Jeffries that he did not know what he was thinking. Jeffries responded by saying, "[T]hat's all you have to

say," or something similar.  Ortega and Quillen got back in the vehicle, and they all went home.  Quillen, however, suspected that Jeffries did not believe them.

On the night of February 28, Quillen awoke to Jeffries punching her in the head. He was saying that he hated her, and that he had reviewed the contents of her phone.  He had found a text message from Quillen to Ortega, in which she said that she "needed to feel his touch."  Jeffries called Quillen a lying bitch, and said, "he knew it was true."  He continued to strike her on the head, side, and leg.  The assault moved from the bedroom into the living room, where Jeffries pushed Quillen over a couch.  Jeffries attempted to strike Quillen with a baseball bat, but Curtis grabbed the bat and told Jeffries that he needed to stop or he would go to jail.  Jeffries told Smith not to let Quillen leave the apartment, and Jeffries and Curtis went out.  When they returned, Quillen heard Jeffries say that they had found Ortega, and that he had said "it was true again."  Curtis said to Jeffries, "[Y]ou call the shots.  Whatever you want done, it's done."  Quillen assumed that they were going to kill her and Ortega.  Jeffries told Quillen that, the next morning, he was going to ask their eldest son if he had ever seen Quillen intimate with Ortega, and if he said yes, Jeffries would kill her.  After telling Curtis and Smith to keep an eye on Quillen and not let her leave or call anyone, Jeffries went to sleep.  Several hours later, Quillen found Jeffries's phone, went into the bathroom, locked the door, turned on the water, and climbed out a window.  She went to a neighbor's apartment and called the police.

On February 29, Officer Christopher Shippen took a statement from Quillen. Shippen observed an injury to the lower left side of Quillen's face, an abrasion by her mouth, swelling on her cheek, and a small cut inside her mouth.

Officers Chris Baptista and Michael Boyd went to 2687 Altos Avenue, apartment 1.  Smith answered the door and allowed police in. Officer Boyd spoke with Jeffries in a back room, and then arrested him.  As Jeffries was being escorted from the apartment, he asked for something warmer to wear. Boyd retrieved a sweatshirt from the bedroom door handle.  According to Boyd, before giving the sweatshirt to Jeffries, he checked it to make sure it did not contain any contraband or weapons.  Police also arrested Smith and Curtis.

As Jeffries was being processed in the booking area of the police station, Boyd discovered that Jeffries had a piece of plastic in his hand which, to Boyd, appeared to contain a controlled substance.  The parties stipulated that narcotics booked into evidence by Boyd on February 29, contained 2.42 grams of methamphetamine.

Fong-Jeffries bailed Jeffries out of jail and immediately moved in with him in the Altos Avenue apartment.  However, Jeffries told others in text messages that he wanted to be with Quillen, not Fong-Jeffries, and he blamed Ortega and Wilkey for the troubles in his relationship with Quillen. Jeffries repeatedly sent messages to Quillen, directly and indirectly, seeking to reconcile.

Jeffries began to spend a significant amount of time with defendant Haven, a methamphetamine customer of Jeffries's who knew Fong-Jeffries from childhood. Haven began to assist Jeffries with his methamphetamine-dealing enterprise.

Concomitantly, on or around March 18, Jeffries began using and texting from a new mobile number, and Haven began to use Jeffries's old number.[FN5]

> FN5.   At trial, the text messages were discussed as being exchanged between specified telephone numbers rather than individuals.  However, the parties do not dispute on appeal the identity of those exchanging the text messages.

In a text message exchange on March 19, Jeffries asked Haven when he was going to get Ortega, and urged Haven to find him.  Subsequently, Haven indicated that he was at Ortega's mother's house, but there was no answer.  Jeffries asked Haven if he thought he was "getting played," and Haven responded that he thought Ortega was just "out doing something stupid . . ." like "[l]ooking for a car."  Jeffries continued to express suspicion that Ortega was going to "fuck [him] over . . .," and Haven responded, "All we can do is watch him and see how he acts.  And if he even looks like he's going to try to fuck you over, I give you my word I'm going to take him down, any means necessary."[FN6]

> FN6.   There are occasional, very minor, discrepancies between the language actually texted, and that transcribed by the court reporter as witnesses and attorneys read the text messages at trial.  These discrepancies have no significance with regard to any issue on appeal.

On March 21, Jeffries texted to Stephanie Engel, "[M]y family is fucked and I ain't no punk [I] miss my girl and [I] am just furious."  As the exchange continued, Engel urged Jeffries to calm down, and stated, "[E]verything needs a plan that you can handle with class.  Isn't that what you tried to teach me?"  Jeffries responded, "No, it ain't, because Theresa manipulates and lies still, and Tony is up to something."  When Engel asked what Jeffries was "doing with him," Jeffries responded, "Class is out the window.  And it will be broadcasted what Amy and my family mean to me very soon."  He continued, "Just think old Italian mafia style.  I love her and now I'm going to show it at the ultimate."  Jeffries texted, "[N]ow they fucked with my heart and it's heart check time."  He further texted, "[S]he'll never doubt my feelings for her again."

On March 22, Engel asked Jeffries if he ever met up with Ortega, and Jeffries responded that Ortega was "avoiding real weird like . . . ."  He clarified, "He's just up — he's just up and runs off, and it's just weird."  Engel responded, "So the problem is he isn't trusting you, right?  He did go for that drive in your truck, right," and Jeffries replied, "Yeah, I think so, but I got him.  It will happen.  Know that."

On March 23, texts from Haven indicated that he was in a truck with Ortega and Dustin Cook.  Haven texted Jeffries that they were getting gas and that they would be there in a minute.  He then reported: "Dustin said he thinks Tony got something hella heavy on him, might be a gun.  Tony dropped it on the floor of the truck."  He then clarified, "He's got it on him.  He picked it up.  It's in his pants."  Within an hour of that exchange, Fong-Jeffries texted Haven, "Please be safe, okay?"  Later, Haven texted to

Keith Davenport: "We were picking up Tony on the way to your place. All the sudden Tony like flipped out, got paranoid and took off walking." He continued, "You ever heard of the saying, keep your friends close, but keep your enemies closer?" Haven subsequently texted to Davenport: "This shit with Tony is about keeping the family protected." Haven then texted Jeffries that Ortega was "nowhere to be found," and, "[l]et me know when to come out. I'll do it right here if need be." Jeffries texted Engel that "the first one's in motion," and that "[i]f all goes well, two to go." After Engel cautioned Jeffries to be careful, he responded, "I need my baby back, so I'm going to show what she means to me. She questioned this one time." Jeffries continued, "And shit like this turns her on. LOL. Yeah, if I'd ever do that for or over her." However, Jeffries subsequently texted Engel, "God damn this mother fucker." Engel asked, "Avoid it?" to which Jeffries responded, "Fuck yes."

On March 24, Jeffries sent a series of text messages to the number of Ortega's mother, Cheryl Cook,[FN7] apparently trying to contact Ortega. Jeffries texted, "Tony, what's up? Hit me back." "You want to make this money or not, bro?" "Hey, I can't wait all night, bro. I'm going in the next hour, so hit me up." "Hey, I get it, bro, don't trip. You asked me to help you come up. I try to help and you blow me off. Thanks, dawg."

> FN7.   We refer to Cheryl Cook and Dustin Cook (no apparent relation) by their first names to avoid confusion.

On March 25, Jeffries texted Haven, "You ready?" When Haven responded that he was, Jeffries replied, "Have the backpack. Going to test-run." Haven texted, "Dusty can grab it for me out of the truck. The piece is on me."

Later on the same day, Haven texted Cheryl's number, stating, "Hey, Tony, it's Robby. Seeing if you home. I was going to come by and see if you wanted to smoke."

On March 26, Haven texted Jeffries, "Ready whenever you are. And are we taking Dustin?" Jeffries responded, "Your call." Haven replied, "I say take him. I know we can trust him. Text me when you're ready." Later, after texting Cheryl's number stating, "[W]e'll be leaving in a few minutes to pick you up." Haven texted Jeffries, "What's up? He's gone." Jeffries responded, "Are you fucking serious?" After Haven asked for instructions, Jeffries asked where he went. Haven responded, "That mother fucker knows something is up. I called to check on him. He was tripping, saying something about you can't outshine the shiner." Jeffries then texted to Cheryl's phone: "Tony, what's up, bro? Did I miss something? Have I done something wrong? I'd like to know." Ortega texted back, "Are you really going there, bro? It's not just you, homeboy. It's everyone, dude." Later in the evening, Jeffries again texted Cheryl's number, "Hey, Tony, hit me up. I got a few more jobs . . . ."

Also on March 26, Haven texted Fong-Jeffries, and asked her, "[C]an you possibly get me a box of what we talked about the other night and bring it home tonight and I'll pay you back when you get here. I just need one box." Fong-Jeffries responded that she could "get them this afternoon," and Haven explained, "It's just with everything

going on, I feel more comfortable having more to sit. feel me?"  Haven then told Fong-Jeffries that he believed that Curtis was attempting to "turn some of the other brothers against" Jeffries.  Haven stated, "I will not let anything happen to [Jeffries], you or the kids."  After Fong-Jeffries thanked Haven for "everything you do," Haven responded, "I will eliminate these obstacles in our way.  I'm done playing with him and Tony."  Fong-Jeffries stated that matters would "be much better for [Jeffries] once this whole situation is resolved."  She subsequently stated: "[O]nce Tony's done, Theresa's going to have to be done quick."  Haven responded, "Yeah, I know she'll be.  I put [Curtis] on the list as well."  Fong-Jeffries replied, "Yeah, [Curtis] needs to be on the list."  When Fong-Jeffries expressed her concern over the possibility that Jeffries could have to "do . . . time," presumably based on the charges involving Quillen, Haven reassured her that he would help, stating, "You guys are my family.  You are never a burden.  It's my honor to ride side by side with you guys.  I love all you guys.  I will give my life to protect you guys.  I don't have people like you and [Jeffries] in my life, people that I call family.  And I just got you back into my life. I thank God every day for that."  Fong-Jeffries again reassured Haven she would get a box for him.

Haven again texted Cheryl's number, stating: "Tony, it's Robby.  You going to be ready when we call?  It will be a little after ten."

The following day, March 27, Haven texted Cheryl's phone, and asked her if Ortega was around, and to have him call Haven.  Haven then texted Fong-Jeffries and stated that he needed to use her car that night.  Fong-Jeffries expressed reluctance, stating: "I need to know what [Jeffries] says because I'm not going to do anything to piss him off."  Haven assured her that Jeffries had been amenable the prior evening when he mentioned it, and stated, "[R]egardless, our Tony problems end tonight."  Fong-Jeffries replied, "I want to make sure [Jeffries] is still good with that.  If you take my car, please be careful. I can't afford to get another one."  Haven then stated, "Me and [Jeffries] think Tony tried to sabotage the truck."  He later stated, "[W]hen it comes to Tony, his luck ends tonight.  You have my word on that."  Fong-Jeffries replied, "Okay.  This definitely needs to come to an end.  I also want to be careful.  I'm seriously mad enough to do something that could get me in trouble."  Haven responded, "I got this.  But you guys have to let me do it my way.  This trying to be his friend and help him shit ain't working."  As the exchange concluded, Fong-Jeffries texted Haven: "Erase these messages, please."

Again on March 27, Jeffries texted Haven, "Job tonight."  Haven asked who was going, and whether Jeffries was going.  When Jeffries responded that Ortega was going, Haven responded, "I know Tony's going.  What I'm asking is, are you going or should I take Dustin?  He said he'd ride all the way. I trust him."  When Jeffries stated that it was Haven's call, Haven responded, "I asked him.  He says he's with the bis."

Stephanie Anton testified that, on March 27, between 4:00 and 5:00 p.m., she saw a big, silver revolver on the coffee table of Jeffries's apartment.  She also testified that she saw Jeffries with the gun stashed in his waistband at his back when he was either in the living room or exiting the apartment.  Thereafter, Anton went to the apartment upstairs to get high.  While she was there, she saw Jeffries's vehicle in the parking lot.  At trial, she testified that she was not sure who was driving the vehicle, but she testified that,

in a police interview in April, she stated that, after Jeffries left the apartment with the gun, she saw his vehicle arrive and saw that Haven was driving.

Cheryl testified that the last time she saw Ortega alive was at her apartment between 8:00 and 9:00 p.m. on March 27. Ortega was with Jeffries and Haven. Ortega and Haven smoked methamphetamine together. Jeffries, Haven, and Ortega then left.

At approximately 11:29 p.m., Haven texted Jeffries, "Next spot [I]'m doin[g] him." Approximately 45 minutes later, Jeffries texted Haven, "Kickin[g] his ass," and Haven later responded, "Beatin[g] the brakes off this lame."

Shortly after 1:00 a.m. on March 28, Jerry Wenger was sleeping in his home on Kasser Road when he awoke to the sound of several loud bangs. After failing to determine what caused the sound, Jerry and his wife Rebecca went back to sleep.

In the early morning hours of March 28, Jenifer Fassett was "ghost hunting" with friends near Kasser Road. When Fassett turned onto Kasser Road, she observed something in the street she believed to be an animal. She quickly realized, however, that it was a person. The individual's face was "scratched up." Fassett started to drive away, but one of her friends convinced her to go back. They drove by the person again, and one of Fassett's friends called 911. Fassett and her friends waited nearby for police to arrive.

Detective Jeffrey Wallace responded to the Kasser Road location at approximately 4:00 a.m. Wallace observed Ortega's body, lying flat on his back on the shoulder of the road, partially in a drainage ditch. Ortega had bullet wounds on his left palm, his left cheek, on the left side of his forehead, in the middle of his chest and back, and on his right forearm. A bottle of pepper spray was clutched in his hand. Near the body, officers found a key chain with two Honda keys that were shaved down, of the type employed by car thieves. A window punch, used to break car windows or other types of glass, was discovered in Ortega's pocket. Wallace did not locate any cartridge cases at the scene.

The pathologist who performed the autopsy on Ortega testified that a bullet entered Ortega's back between his shoulder blades traveled into his chest, broke a couple of ribs and punctured a lung, and exited Ortega's chest at the base of his neck. This was a fatal wound. Ortega also had a gunshot wound on his right forearm. Additionally, a bullet entered the back of Ortega's hand and came out the palm of his hand. The tips of Ortega's middle and ring fingers were injured, suggesting that Ortega's hands were "curled" when he was shot. The physician also theorized, based on the irregular shape of the wound to Ortega's forearm, that the bullet which caused that wound may have struck something else first, perhaps Ortega's right hand. Finally, Ortega had a gunshot wound to the right side of his face over his cheekbone. The bullet passed through Ortega's right eye socket, behind the nose, and exited the left side of his face. One wound could have been a reentry wound, so Ortega was shot either three or four times.

Late in the morning of March 28, Fong-Jeffries texted Haven to wake him up. Fong-Jeffries asked, "Did everything go as planned? I haven't been able to talk to [Jeffries] about anything yet." Haven responded, "You, [Jeffries] and the kids are a little bit safer now. The security system has been tightened up. I told you I'd fix it. Feel me?" Fong-Jeffries replied, "Thank you. It means a lot to me, everything that you do." Haven then asked whether he could ask a "dumb question." Haven texted, "I already know the

answer but [I] just need to hear it ok.  I can trust [Jeffries] right[?] I mean [you] know to hav[e] my ba[c]k[?]  Please don['t b[e] mad at me for askin[g]."  Fong-Jeffries responded, "I'm not mad.  Yes, he will always have your back.  He loves you.  You have been there for him and he'll be there for you.  The only way things would change would be if you fucked him over, which we both know would not happen.  What's making you stress on that?  Did something happen or was something said?"  Haven responded that nothing happened.  He texted, "[L]ike [I] told him last night [I] would do anything last night.  I love [Jeffries].  I just wanted to hear it [you] feel me."  Haven subsequently texted, "Hey [you] know [Jeffries] was on the phone last night.  He was talkin[g] [a]bout me & he called me his ace duce [sic] & his kid.  It made me feel so good."  He then texted, "I love you, Wendy.  I would do anything for you guys."  When Fong-Jeffries texted that she hoped Haven realized that the loyalty "goes both ways," Haven responded, "I do know that.  Otherwise, I wouldn't have done what I did.  You know, I'm [Jeffries's] kid, remember?"  Haven then texted Fong-Jeffries that he needed another "toy."  Fong-Jeffries replied that she had to take a test before she could buy anything, and that they would have to "see what you want and price it out."  Haven responded that he could "take one off the street, it don't matter."  Fong-Jeffries responded, "we're going to have to find one.  You talk to [Jeffries] about it?"

Bianca Villanueva testified that she used to sell large quantities of methamphetamine to Jeffries.[FN8]  Occasionally, Villanueva would conduct these transactions with Haven if Jeffries was unavailable.  Towards the end of their business relationship, Jeffries occasionally paid Villanueva with items other than cash.  Jeffries had paid Villanueva with two guns, a computer, and ammunition.  Villanueva testified that, at one point, Jeffries had told her that he had a particular gun for her as well as a sum of money.  On the morning of March 28, when Villanueva woke up, she discovered that she had multiple missed calls from both Jeffries and Haven, who had been calling her "all night."  Eventually, Haven called her again and stated that Jeffries wanted her to come to his apartment.  She then got a ride from a friend and went to the apartment to pick up the gun. Jeffries gave Villanueva a .357-caliber handgun.  Both Jeffries and Haven seemed to take care not to touch the gun with their bare fingers; it was wrapped in a shirt.  Villanueva placed that gun in a safe in her storage unit, where she also stored a box of 50 rounds of ammunition that Jeffries gave her.

FN8.   Villanueva testified under a grant of immunity.

Dustin Cook was a methamphetamine user who obtained drugs from Jeffries or Haven.[FN9]  Dustin performed errands for Jeffries and Haven in exchange for methamphetamine, including delivering drugs and collecting money.  Dustin testified that, one day while he was in one of the apartments at Altos Avenue, Haven stated that he needed to speak with him in the bathroom.  Haven then told Dustin that the "issue with Tony is done."  Dustin asked what Haven meant, and Haven responded, "Tony, I took care of him."  Dustin continued to express confusion, and Haven then told Dustin that he shot Ortega.  As he was speaking, Haven pulled a handgun from his waistband and set it

on his lap.  Haven told Dustin that he and Ortega got out of a car, and Haven walked up behind Ortega and shot him three times in his back. Jeffries had remained in the car. After Haven told Dustin about the shooting, Haven, with the gun still on his lap, asked Dustin, "You ain't going to turn on me, are you?"  Dustin told the jury that, after Jeffries was arrested, Fong-Jeffries asked him to testify that Jeffries was at home at the relevant time.  She also asked him to testify that Jeffries had gone with her to Yuba City.

FN9.   Dustin Cook also testified under a grant of immunity.

On April 11, Fong-Jeffries texted Jeffries, "I typed up the letter.  How many copies do you think I should make?  I got the address for the District Attorney's office." She subsequently texted Jeffries, "Dustin is coming down with the signatures for you. I'm telling you, Dustin got it down."  Quillen testified that she neither wrote nor signed a letter which was sent to the district attorney's office, People's Exhibit number 12, in which someone purporting to be Quillen requested that the domestic violence charges against Jeffries be dropped.

On April 13, Officer Robert Young participated in a search of apartment 2 at 2687 Altos Avenue.  Young detained Haven in the kitchen.  Young asked Haven if he had any weapons, and Haven responded, "It's on my hip."  Young searched Haven and found a loaded nine-millimeter handgun as well as a small amount of methamphetamine on Haven's person.  Upon running the serial number for the gun, Young learned that it was registered to a Buck L. Fong in Woodland.  The parties stipulated that the narcotics booked into evidence by Young on April 13, contained .65 grams of methamphetamine.

On April 14, Detective Tom McCue searched Villanueva's storage unit.  Among other items, McCue found a safe which contained approximately one ounce of methamphetamine, a .357-caliber Taurus handgun, and a box of .357-caliber bullets with four rounds missing.  Forensic analysis revealed that a bullet jacket recovered during Ortega's autopsy matched bullets test fired from the gun.

Detectives picked up Villanueva three days later.  After she learned that her storage unit had been searched, Villanueva contacted Jeffries.  She informed him that police seized the guns and drugs in her storage unit.  Jeffries told her to tell police that she acquired the guns from some "pisos," or Mexicans.

**Defendant Jeffries's Case**

Shayleen Leary, Jeffries and Fong-Jeffries's 18-year-old daughter, testified that, on March 27, she was at the apartment on Altos Avenue, and she was sick.  Jeffries went out to do some errands, and he arrived home at 11:30 p.m.  Leary saw Jeffries come home, and he did not go out again.  Leary was on the living room couch, and anyone leaving the apartment would have had to pass her to exit.  Jeffries was still at the apartment when Leary awoke in the morning.  Leary never saw Jeffries with a gun.

Desiree Dynes, Jeffries's best friend and a friend of Haven, testified that, on the night of March 27, she was having problems with her former husband.  At approximately midnight, she went to the apartments on Altos Avenue, where she saw Jeffries in his

apartment.  Dynes then hung out with the people who lived in the apartment upstairs until approximately 6:00 a.m.  During that time, she sat on the exterior stairs.  According to Dynes, Jeffries was home during this entire time.

Vic Arneson lived in one of the apartments on Altos Avenue. Arneson testified that Haven told him, "he handled Tony."  Haven stated that "no one fucks with my family."  Jeffries's name never came up.

Theodore McQueen testified that Haven began staying with him in his apartment on Altos Avenue a little before March.[10]  One night, at approximately 3:00 or 3:30 a.m., Haven asked McQueen to "get rid of some stuff for him . . . . ."  McQueen placed clothing Haven gave him in a bag, rode his bike down to the river, poured lighter fluid on the bag, and set it on fire.  McQueen also testified that Haven asked how to remove gunshot residue from one's hands.  McQueen told him how to remove gunshot residue, and had his girlfriend get the materials required.  McQueen testified that he had seen Haven with a gun on two or three separate occasions.  He saw Haven with a black semi-automatic pistol on the day that Haven was arrested for possession of methamphetamine.  Approximately one to two weeks earlier, he had seen Haven with a revolver.

FN10.  McQueen testified under a grant of immunity.

Granvil Smith testified that, on February 29, he was in Jeffries's apartment on Altos Avenue when he was arrested.  Smith had seen Ortega at that apartment on the evening of February 28. Ortega took bundles of methamphetamine out of his black windbreaker, gave Smith two, and placed one back in his pocket.  The next day, police arrived at the apartment and woke Jeffries.  Jeffries came out of his bedroom with no shirt on, and he asked the arresting officers if he could get a shirt.  One of the officers grabbed Ortega's black windbreaker off of the couch, threw it over Jeffries's shoulder, and placed Jeffries in the police car.  Smith testified that Jeffries was not present when Ortega shared his methamphetamine with Smith, and Jeffries would have no reason to know that there were drugs in the windbreaker.

### Defendant Fong-Jeffries's Case

Fong-Jeffries testified about the various text messages.  She testified that, when Haven asked her in a text message for "a box of what we talked about the other night," he was referring to ammunition.  On cross-examination, Fong-Jeffries testified that, when Haven asked for ammunition, she did not know that he intended to use the .357-caliber handgun to shoot Ortega.  Haven had not told her what the ammunition was for, only that he "had problems with people and he was concerned with his well-being."  She testified on cross-examination that Curtis had threatened Haven's life.

Fong-Jeffries testified that, when, in text messages, she stated that matters would be better for Jeffries when "this whole situation is resolved," she was referring to people, including Ortega and Curtis, using Jeffries for money and drugs.  She further testified that, when she texted that, once Ortega is done, "Teresa is going to have to be done

quick," she was referring to cutting them off.  Further, when Haven texted Fong-Jeffries that their "Tony problems end tonight . . . .," she believed that Haven intended to "confront [Ortega] and basically kick his ass and tell him to stay away."  Thereafter, she thought Ortega would no longer "com[e] around and mooch[ ] off of [Jeffries]."  Additionally, when Haven texted her, "That dope fiend piece of shit.  When it comes to Tony, his luck ends tonight.  You have my word on that," she believed Haven was indicating that he was cutting Ortega off and that he would no longer be lucky enough to get things from Jeffries.  She testified that when she texted Haven to ask him "if everything went as planned last night," she was referring to the installation of security cameras.

Fong-Jeffries further testified that when Haven texted her that he needed a new toy, he was referring to a gun.  She testified that a gun found on Haven was registered to her father, Buck Fong.  She told the jury that Haven had wanted to buy the gun, but she had not wanted to sell it to him.  She did not discover that the gun was missing from her car until after Haven was arrested.

Fong-Jeffries admitted that she prepared the retraction letter that was eventually sent to the district attorney's office purportedly by Quillen.  However, she did not sign it.

On cross-examination, Fong-Jeffries explained that she had asked Haven to delete all of the text messages because the people discussed in those messages were Jeffries's friends, and, while she did not want them around, she also did not want to fight with Jeffries about them.

Fong-Jeffries testified that, while Jeffries "didn't think it was cool . . . that [Ortega] had gotten with his ex," he did not particularly care that Ortega had slept with Quillen.  Fong-Jeffries explained that, by that time, Jeffries was with her.  She also testified on cross-examination that Jeffries told her that "he was sending texts out to people about how much he loved Amy Quillen just to track her to serve a restraining order."  According to Fong-Jeffries, they deliberately "made it seem like we had split up just so we could find out where she was."

On cross-examination, Fong-Jeffries testified that, when she was arrested on June 13, she told detectives that Haven had told her he shot Ortega.  She acknowledged that she never told law enforcement about this admission between April 25, and her arrest on June 13, during which time Jeffries was in custody for Ortega's murder.

**Defendant Haven's Case**

Haven testified that he did not kill Ortega. Rather, on March 28, he witnessed Jeffries kill Ortega.

Haven testified that, during the time he was staying in an abandoned house across the street from the Altos Avenue apartments, Jeffries came over holding a baseball bat, accompanied by Curtis.  He demanded to know where Ortega was. Jeffries saw Ortega and "went at [him] with the baseball bat." However, Curtis "wrapped him up" and urged Jeffries not to "do this here."  Jeffries yelled at Ortega, accusing him of sleeping with or trying to sleep with Quillen.  Ortega claimed that Quillen had hit on him, but that he never touched her.  They all agreed to return to Jeffries's apartment and confront Quillen.

11

Jeffries, Ortega, and Curtis all left.  Fifteen to 20 minutes later, Curtis returned to the abandoned house where Haven was and asked if Ortega had come back, and Haven responded that he had not.  Later that night, Haven saw Ortega with a .32-caliber gun.

The next day, Haven observed law enforcement officers at the Altos Avenue apartments.  After the officers left, Haven went to the apartment complex and found out what had happened.  Fong-Jeffries's name came up during the conversation.  Haven had known Fong-Jeffries since childhood, as their mothers were close friends.  When he was 13, Haven's family moved out of the neighborhood, and Haven and Fong-Jeffries fell out of touch for years.  When her name arose, Haven told the person with whom he was speaking to tell him when she came over so that he could speak to her.

Later, someone notified Haven that Fong-Jeffries was moving into the apartment complex.  Haven recommended a particular bail bonds agent to Fong-Jeffries.  He also went with her to meet with the agent and pay him.  Later that night, Jeffries returned home.  As Haven was leaving the apartment complex that night, he told Jeffries that he would be happy to help him with anything he needed.

After this, Haven's relationship with Jeffries changed.  A couple of days later, Jeffries asked Haven to watch his apartment while he was gone.  Then he asked him to watch his older son a couple of times.  Haven started helping keep the house in order.  Approximately one week after Jeffries's release from jail, Haven became involved in Jeffries's drug business.  Haven offered to sell methamphetamine for him.  From that point on, if Jeffries was not home, Haven would "take care of the business."  He also began to make runs for Jeffries, dropping off product or picking up money.  He would also meet with a supplier.  Jeffries paid Haven in methamphetamine, as well as some cash.

At the beginning of March, Haven moved from the abandoned house to the Altos Avenue apartment directly above Jeffries's apartment.  Jeffries provided Haven with a mobile phone.  Initially, Jeffries allowed a number of people to use that phone.  At some point between March 19 and 22, however, that phone was mostly in Haven's possession.

In mid-March, after having spent some time away from the area, Ortega started coming around the Altos Avenue apartment complex again.  However, he would stop by very briefly, but would never stay long.  Then he began to accompany Jeffries and Haven on trips they took out of town looking for Quillen.  At first, it struck Haven as odd that Jeffries was spending time with Ortega again.  At one point, Haven asked Jeffries why he was renewing acquaintances with Ortega, under the circumstances.  Jeffries responded that Ortega had agreed to help him find Quillen and bring her home.

Haven acknowledged several text messages between him and Jeffries discussing whether Jeffries should trust Ortega.  These included the message Haven sent to Jeffries in which he stated: "if he even looks like he's gonna try to fuck you over I give you my word I'm gonna take him down any means necessary."  Haven explained that, if Ortega attempted to cross Jeffries, he would handle it, by which he meant "[a]t the most beating him up."

On March 19, Jeffries and Haven were coming from court on Power Inn Road in Jeffries's Yukon.  Suddenly, the left front tire turned straight to the left, and the Yukon

spun around.  Once they managed to get the vehicle off of the road, Haven inspected it and saw that the tie rod had come apart.  Upon closer inspection, Haven saw that the nut securing the tie rod was missing.  Haven performed a temporary repair so that they could drive back to Altos Avenue, where Haven worked more extensively on the vehicle.

After the incident, Jeffries told Haven that he believed Ortega had tampered with the Yukon.  Haven confirmed that the particular way in which the tie rod assembly had failed was not a defect that would arise from road vibration or other normal wear and tear. Haven agreed that someone had tried to sabotage the truck and thought Curtis could have been the person, because Curtis was upset that Jeffries was no longer allowing him to stay at his apartment.

Haven began to perceive Ortega as a threat.  In addition to the incident involving the Yukon, Jeffries told Haven that Ortega was jealous of Haven, and angry that Haven had essentially usurped his position of influence with Jeffries.  On one occasion, Jeffries and Ortega were riding in the front of Jeffries's Yukon while Haven was in the back. Ortega was upset about the situation between him and Jeffries.  Ortega looked at Haven and said to Jeffries, "Now you're riding around with this fucking guy?"  Jeffries told Haven that Ortega wanted Haven out of the picture, and that he would use any means necessary.

At some point, Jeffries began to talk about "taking [Ortega] out."  At first, when Jeffries began to talk this way in relation to the situation with Quillen, Haven did not believe that Jeffries was serious.  However, he later came to believe that Jeffries's desire to have Ortega killed was genuine.  Additionally, Haven spoke with Jeffries about the possibility of Haven killing Ortega because Haven was genuinely concerned that Ortega was going to kill him first.

Haven agreed to help Jeffries kill Ortega.  (6 RT 1726)  He did not agree because Ortega had a relationship with Quillen, and he did not agree merely to help Jeffries.  He told the jury he did it because he felt that Ortega was a threat to his life.

Jeffries proposed that they lure Ortega out on jobs, such as stealing cars, so that Haven could shoot him.  Haven agreed.  After prior attempts to lure Ortega out failed, on March 27, Haven and Jeffries drove to Ortega's mother's apartment in Fong-Jeffries's car to pick Ortega up.  Haven testified that he did not know whether Jeffries was armed. They stayed at Ortega's mother's apartment for approximately 20 or 25 minutes.  Haven smoked methamphetamine with Ortega.  Thereafter, Haven, Jeffries, and Ortega left to look for a "pot farm" Ortega knew of.  After they were frustrated in their plan to steal marijuana plants, Ortega became despondent, as he needed money and a car.  Haven indicated that he had shaved keys at his apartment, so they went and retrieved the shaved keys, and Haven gave them to Ortega.  Ortega and Haven smoked again.  They then drove off looking for a car to steal.

At one point, Haven and Ortega exited the vehicle and walked up towards a driveway.  However, Haven told Ortega he thought he saw someone on the porch.  When asked if it was Haven's plan to actually steal a car from that property, Haven responded that "[i]n a way it was something different."  He clarified, "It was one of the opportunities that I had to shoot . . . Ortega."  Haven also admitted that, at this time, he texted Jeffries,

13

"Next spot I'm doing him."  Haven stated that "at that time that was [his] . . . plan."  According to Haven, he then texted, "Beating the brakes off this lame."  By sending this text, Haven's intention was to cover up the fact, suggested by his prior text, that he planned to shoot Ortega.

At some point during the night, Haven changed his mind about shooting Ortega.  He testified that he had the opportunity to shoot Ortega when they were attempting to steal marijuana plants, but he decided not to because he was not a killer.  He also had the opportunity to shoot Ortega near the house where they planned to steal a car, but, again, he did not do so.  Later, in a more remote area in Elverta, Haven had the opportunity to shoot Ortega when all three got out of the car to urinate.  However, he did not shoot Ortega.  Thereafter, they drove for 15 to 20 minutes until they arrived at Kasser Road.

They approached the Wenger residence on Kasser Road and drove by slowly.  They made a U-turn and stopped on the road between the Wenger residence and the next house.  All three exited the vehicle.  Haven walked beside Ortega, and they shared a cigarette.  Haven then heard a gunshot.  He turned around and saw Jeffries walking towards Ortega firing a gun at him.  Haven heard Jeffries fire three rounds.  Haven then looked at Ortega and saw him spin around and fall down backwards.  After Jeffries shot Ortega, he told Haven to "get in the fucking car."  Haven did, and they left.

Haven testified that, at some point prior to the shooting, he had stopped wanting Ortega dead.  While he had wanted Ortega dead at one point because he thought Ortega was going to kill him, eventually, he either changed his mind or could not do it.

As they drove back to the Altos Avenue apartments after the shooting, Haven and Jeffries both attempted to contact Villanueva because Jeffries's plan was to give her the gun.  Having failed to reach Villanueva, Jeffries instructed Haven to give the gun to Ricky Chesser until they could get it to Villanueva.  Jeffries told Haven that, if he was questioned by police, he was to say that they had been out in Jeffries's Yukon and it broke down on Roseville Road.  Therefore, they had to walk to Jeffries's friend Keith Davenport's house so that he could help them fix the truck and get home.  When asked why he went along with Jeffries in telling this cover story, Haven stated that he was scared of Jeffries, because he had "just watched him blow somebody away, [and] [he] didn't want to be next."  Jeffries also asked Haven if he knew how to get rid of gunshot residue, and Haven responded that he would try to find out.

Back at the Altos Avenue apartments, Jeffries gave Haven the .357.  Haven wrapped it in a red shirt and gave it to Chesser and told him to hang onto it.  Haven asked McQueen if he could borrow some clothes, and he also asked him to take the clothes he had been wearing and burn them.  Haven also asked McQueen if he knew how to get rid of gunshot residue.  McQueen offered some advice, and Haven relayed that information to Jeffries.

The following day, Villanueva came by the apartments and picked up the gun.  Haven handed the gun, wrapped in a cloth, to Villanueva.  The same day, when Haven texted Fong-Jeffries that she, Jeffries, and the kids were "a little bit safer now," he was referring to the security cameras.  When he texted Fong-Jeffries asking whether he could trust her and Jeffries, he was referring to the events of the night before.  Having watched

Jeffries shoot Ortega, Haven was afraid of him and wanted to be sure that Jeffries did not see him as a liability. Similarly, when he texted that he knew the "loyalty goes both ways," and that, otherwise, he would not have done what he did, he was referring to agreeing to go along with the cover story and getting rid of the murder weapon.

As for his text to Fong-Jeffries about not trusting Curtis, Haven testified that Curtis had already attempted to stab him once. During a drug deal, Curtis pulled a knife on Haven, and Haven pulled out the nine-millimeter. Haven testified that, when he and Fong-Jeffries texted each other to the effect that Wilkey and Curtis "are next," he meant that they needed to be "out of the picture." However, by this, he did not mean that they should be killed. Rather, he only meant that they needed to be "[g]one," and "away from" Haven, Jeffries, and Fong-Jeffries.

Haven acknowledged that he possessed firearms at various times. He had a nine-millimeter handgun which he acquired from Fong-Jeffries. Fong-Jeffries gave Haven the gun because, with Jeffries's domestic violence case ongoing, she did not want it in their apartment. Haven also stored a sawed-off shotgun for a couple of days until Villanueva picked it up. Additionally, he stored the .357-caliber handgun for one night, the night Ortega was shot. Haven testified that, when he texted Fong-Jeffries about obtaining more ammunition, he was referring to ammunition for the nine-millimeter that she had given to him, not the .357.

Haven testified that, following his arrest, he spoke with law enforcement about this case on three occasions. The day he was arrested, he took the arresting officers to Villanueva's storage unit and told them that the .357 revolver they found in the storage unit was possibly the gun used in Ortega's murder. However, he did not tell them that Jeffries shot Ortega because he was still afraid of Jeffries. Shortly thereafter, Haven spoke with Detective McCue. They discussed the fact that the .357 may be the murder weapon, but Haven denied involvement in the murder or knowing who committed it. A couple of months later, Haven spoke with Detectives McCue and Swisher, and this time told them that he saw Jeffries shoot Ortega.

Haven denied ever telling Fong-Jeffries, Dustin, or anyone else that he shot Ortega. He acknowledged that, in an interview with detectives after his arrest, he told them that Fong-Jeffries knew Jeffries was planning to kill Ortega. However, he further testified that he and Jeffries did not discuss their plan in front of Fong-Jeffries. Rather, according to Haven, his belief that Fong-Jeffries knew about the plan was based on the fact that Jeffries had told him that he discussed the plan with Fong-Jeffries.

After all parties rested, Haven was permitted to reopen his case to present the testimony of Carla Huffman, who was housed in the same pod in the Sacramento County Jail as Fong-Jeffries. Huffman testified that inmates can pass written communications through the plumbing by what inmates refer to as a "fishing line" or a "kite." Huffman testified that, when Fong-Jeffries learned that Huffman and her roommate were "fishing back and forth to the boys upstairs on the 8th floor," she asked Huffman to "pass some mail." Huffman sent kites for Fong-Jeffries three or four times. Huffman testified that she read the kites she sent and received for Fong-Jeffries. When Fong-Jeffries gave Huffman two additional kites to send, Huffman contacted the district attorney's office and

offered to exchange the kites for a better deal on her case.  Huffman turned the two kites over to a representative for the district attorney's office.

According to Huffman, when Fong-Jeffries gave her one of the earlier kites to send, she stated that she had to go to court to testify, and that she "needed the questions in the kites answered as soon as possible . . . ."  Huffman testified: "In all the kites, she needed to know what to say because it was her turn to testify, and she was scared."

Huffman also testified that Fong-Jeffries once asked her if she could be in trouble for giving someone a gun.  When Huffman responded that she could, Fong-Jeffries stated that she had given Jeffries a gun.  Although in this conversation, Fong-Jeffries did not specify the type of gun she had given to Jeffries, Huffman had seen a reference in the first kite to a .357.  She also referred to the fact that Jeffries had killed someone named Ortega.  In one of the kites, there was a question as to whether she was supposed to say that Jeffries picked her up from work on a particular day, even though Fong-Jeffries told Huffman that he had not picked her up from work.

Haven also called Fong-Jeffries.  She acknowledged that three exhibits were letters that she had written to Jeffries while incarcerated with the intention of having them delivered to him.  She also acknowledged that there had been additional letters. Fong-Jeffries testified that she had solicited others in addition to Huffman to send kites to Jeffries.  She acknowledged that, in her kites, she had asked Jeffries how she should answer questions or explain certain facts during her testimony.  However, she also testified that she "wasn't looking for [Jeffries] to answer [her] questions." Instead, her letters contained both questions and answers.  She was merely "looking for [Jeffries] to read this over to see if that's all [she] needed to go by."  She wanted him to point out if she had missed anything.  In a letter in which she expressed that she hoped he would answer her questions, she was referring to questions about how the family was doing, not questions about the case.  She subsequently testified that she was not trying to "get [her] testimony together with . . . Jeffries through these written communications."  She denied writing anything in a letter about whether Jeffries picked her up from work on a given day.  She also denied ever talking with Huffman about her case.

Fong-Jeffries testified, for the first time, that Haven had threatened her.  She stated that she had previously indicated that she was worried for her own welfare and that of her family.  When asked why she had not specifically testified before that Haven had threatened her, she responded that no one had asked.

Fong-Jeffries testified that she never told anyone in her pod that Jeffries killed Ortega.

### Defendant Fong-Jeffries's Rebuttal Case

Fong-Jeffries presented the testimony of Roshann Harris as a rebuttal witness. Harris testified that Fong-Jeffries was her cellmate at the Sacramento County Jail.  Harris testified that, in her presence, Fong-Jeffries never talked about her case.  She testified that Fong-Jeffries was a very quiet person and did not speak much with anyone.

Harris testified that she had come to know Huffman at the jail.  She had observed Huffman attempting to gather information from other inmates about their cases.  Harris never saw Fong-Jeffries talk to Huffman.

*People v. Haven*, No. C074940, 2019 WL 4051881, at *2-15 (Cal. Ct. App. Aug. 28, 2019).

At the conclusion of trial, the jury found Fong guilty of first-degree murder with the special circumstance of intentionally killing by means of lying in wait, and also found her guilty of falsifying a document.[1]  The trial court subsequently sentenced Fong to an indeterminate term of life imprisonment without the possibility of parole ("LWOP") on the murder count and a consecutive determinate term of two years on the falsifying a document count, resulting in an aggregate sentence of two years determinate plus LWOP.[2]

Through counsel, Fong appealed her conviction, arguing that: 1) the prosecution presented legally-insufficient evidence to support the lying-in-wait special circumstance as to Fong; 2) the trial court erred in instructing the jury on the lying-in-wait special circumstance; 3) the trial court incorrectly instructed the jury that Fong could be guilty of murder on a theory of accomplice liability based on an uncharged conspiracy; 4) the accomplice testimony lacked

---

[1]	The jury also found Jeffries and Haven each guilty of first-degree murder with the special circumstance that they intentionally killed Ortega by means of lying in wait, as well as falsifying a document.  The jury found not true as to both Jeffries and Haven the enhancement alleging personal use of a firearm.  The jury also found Jeffries guilty of possession of a firearm by a felon, willful infliction of corporal injury on Amy Quillen, and possession of a controlled substance.  The jury further found Haven guilty of possession of a firearm by a felon (two counts), and possession of a controlled substance.

[2]	Jeffries and Haven were likewise sentenced to an indeterminate term of LWOP on the murder count.  The trial court also sentenced Jeffries to a consecutive determinate sentence of five years on the count of infliction of corporal injury and consecutive terms of eight months on each of the remaining counts.  Haven was additionally sentenced to a consecutive determinate term of two years on the felon in possession count and consecutive terms of eight months on each of the remaining counts.

sufficient corroboration; 5) the trial court interfered with Fong's rights to testify and present a defense when it gave jurors accomplice instructions that undermined her credibility; and 6) the cumulative effect of the errors warranted reversal of her conviction.  The Court of Appeal unanimously affirmed the judgment against Fong in a reasoned, unpublished opinion issued on August 28, 2019.  *Haven*, 2019 WL 4051881, at *34.[3]  Fong petitioned for review in the California Supreme Court, raising all claims unsuccessfully raised before the Court of Appeal. The Supreme Court denied review without comment on December 16, 2019.

Fong timely filed a *pro se* Petition for a Writ of Habeas Corpus in this Court on April 22, 2020.  Docket No. 1 ("Petition"); *see* 28 U.S.C. § 2244(d)(1),(2).

## II. GROUNDS/CLAIMS

In her *pro se* Petition before this Court, Fong argues, as she did before the California Court of Appeal on direct appeal, that: 1) the prosecution presented legally-insufficient evidence to support the lying-in-wait special circumstance as to Fong; 2) the trial court erred in instructing the jury on the lying-in-wait special circumstance; 3) the trial court incorrectly instructed the jury that Fong could be guilty of murder on a theory of accomplice liability based on an uncharged conspiracy; 4) the accomplice testimony lacked sufficient corroboration; 5) the trial court interfered with Fong's rights to testify and present a defense when it gave jurors accomplice instructions that undermined her credibility; and 6) the cumulative effect of the errors warranted reversal of her conviction.

---

[3]     The Court of Appeal unanimously affirmed the judgments against Haven and Jeffries as well.  *Id.* at *34.

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."  *Id.* at 412.  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts.  *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"  *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding.  *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied).  It is a fundamental precept of dual federalism that the states possess primary

authority for defining and enforcing the criminal law.  *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court.  *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)).  A summary denial is an adjudication on the merits and entitled to deference.  *Harrington v. Richter*, 562 U.S. 86, 99 (2011).  Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Fong has not replied to Respondent's answer.  The relevant statute provides that "[t]he allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true."  28 U.S.C. § 2248; *see also Carlson v. Landon*, 342 U.S. 524, 530 (1952).  Where, as here, there is no traverse filed and no evidence offered to contradict the allegations of the return, the court must accept those allegations as true. *See Phillips v. Pitchess*, 451 F.2d 913, 919 (9th Cir. 1971).

IV. DISCUSSION

A.    _Insufficiency of the Evidence—Lying-in-Wait Special Circumstance_ (Ground 1)

Fong first argues that the evidence presented was insufficient to prove the lying-in-wait special circumstance as to her.  As articulated by the Supreme Court in _Jackson_, the constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, _any_ rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  _Jackson v. Virginia_, 443 U.S. 307, 319 (1979) (emphasis in the original); _see also McDaniel v. Brown_, 558 U.S. 120, 132-33 (2010) (reaffirming this standard).  This Court must therefore determine whether the California court unreasonably applied _Jackson_.  In making this determination, this Court may not usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial.  _Jackson_, 443 U.S. at 318-19.  Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution."  _Id._ at 326.

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law.  _See Engle v. Isaac_, 456 U.S. 107, 128 (1982).  Consequently, although the sufficiency of the evidence review by this Court is grounded in the Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set forth in state law.  _Jackson_, 443 U.S. at 324 n.16.  This Court must also be ever mindful of the deference owed to the trier of fact and the sharply limited nature of constitutional sufficiency review.  _Juan H. v. Allen_, 408 F.3d 1262, 1275 (9th Cir. 2005).  A fundamental principle of our

21

federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam); *see West v. AT&T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law.  When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . .").

Under California law, the elements of the lying-in-wait special circumstance for murder (CAL. PENAL CODE § 190.2(a)(15)) are "an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage" and "during the period of concealment and watchful waiting."  *People v. Moon*, 117 P.3d 591, 604 (Cal. 2005); *see also People v. Cruz*, 187 P.3d 970, 1003 (Cal. 2008).  In raising her insufficiency claim on direct appeal, Fong argued that the jury's true finding on the lying-in-wait circumstance could not be sustained as to her because there was insufficient evidence that, as an aider and abettor, she intended the actual perpetrators to carry out the murder by lying in wait.  But the Court of Appeal rejected that argument, determining that "[h]er contention is based on an erroneous theory of what must be proved to establish an aider and abettor's culpability for a lying-in-wait special circumstance. . . . [T]he People were not required to prove that Fong-Jeffries intended Ortega's murder be committed by means of lying in wait, only that she had the intent to kill and that the actual perpetrators committed the murder by lying in wait."  *Haven*, 2019 WL 4051881, at *20.

In the instant Petition, Fong again argues that, "even if there was sufficient evidence to prove she aided and abetted murder, there was insufficient evidence to prove that she aided and

abetted . . . murder committed by lying in wait." Docket No. 1 at 6.  Fong appears to again claim

that the lying-in-wait special circumstance as to an aider and abettor requires that the aider and

abettor intend that the principals commit the offense by lying in wait.  But the Court of Appeal's

holding to the contrary is binding on this Court.  Although Fong may disagree with that court's

interpretation of the lying-in-wait circumstance, as stated above, a state court's interpretation of

state law, including one announced on direct appeal of the challenged conviction, binds a federal

court on habeas review.  *See Bradshaw*, 546 U.S. at 76.  Fong argues, without citation, that "[t]he

California Supreme Court has ruled contrary to the Court of Appeal in the instant case, as has the

United States Supreme Court."  Docket No. 1 at 6.  But she fails to cite any such cases that would

constitute clearly-established authority of the United States Supreme Court, and this Court is not

aware of any.  Absent such authority, Fong's claim fails.

Moreover, Fong fails to show that the California state courts' determination that the

evidence was legally sufficient to establish that the murder was committed by lying in wait

constituted an unreasonable application of *Jackson*.  Ample evidence supports a reasonable trier

of fact's finding of proof of guilt beyond a reasonable doubt for the lying-in-wait circumstance.

As the Court of Appeal reasonably explained:

> Haven testified that Jeffries had told Fong-Jeffries about their plan to kill
> Ortega.[FN12]  And the other evidence establishes that Fong-Jefferies shared the intent to kill
> with Haven and Jefferies and aided and abetted the duo by encouraging their activities
> and supplying the ammunition and vehicle to carry out the plan.
>
> > FN12.  In admitting this testimony, the trial court expressly did not limit its
> > admissibility to Jeffries, concluding that Jeffries's statement was a
> > declaration against interest.  Such statements are nontestimonial and their
> > admission does not violate a defendant's confrontation clause rights.

23

As for the nature of that plan, and Haven's and Jeffries's prior attempts to carry it out, the evidence established that they repeatedly attempted to coax Ortega out with them under the artifice that they would engage in criminal enterprises together, such as stealing cars, in order to lure him to a secluded location where they could shoot him. Jeffries and Haven obviously concealed their true purpose from Ortega. They also persevered through a substantial period of waiting for an opportune time to act. Finally, on March 28, 2012, after succeeding in luring Ortega to a secluded location under the guise of a trip to steal cars, either Haven or Jeffries or both shot Ortega in the back, clearly a surprise attack on an unsuspecting victim from a position of advantage.

Fong-Jeffries engaged in numerous text message conversations with Haven in the days leading up to Ortega's murder from which it can be inferred that she was aware of the plan to kill Ortega. On March 23, shortly after Haven texted Jeffries that he was with Ortega and Dustin in the truck, and he believed that Ortega had what might be a gun, Fong-Jeffries texted Haven, "Please be safe, okay?" In a message on the afternoon of March 26, Haven asked Fong-Jeffries if she could get him "a box of what [they] talked [a]bout the other night." When Fong-Jeffries asked whether everything was okay, Haven responded, "[i]t's just with everything goin[g] on [I'd] feel more co[m]fortable havin[g] more [than] 6 feel me." Haven then stated that he "will eliminate these [obstacles] in our way. I[']m done playin[g] with him [and] [T]ony." Fong-Jeffries then stated, "[you] know once [T]ony done [T]eresa is gonna have to be done quick." Fong-Jeffries subsequently reassured Haven she would "get a box for [him]." The box of ammunition, minus some of its contents, and the murder weapon were later found in Villanueva's storage unit.

On the afternoon of March 27, 2012, the day of the murder, Haven texted Fong-Jeffries that he needed to use her car that night. Fong-Jeffries asked what Jeffries said about that. She then stated, "I need to know what [Jeffries] says cuz I'm not gonna do anything to piss him off . . . ." After responding that Jeffries had been agreeable the previous night, Haven texted Fong-Jeffries, "But regardless our [T]ony problems end tonigh[t]." Fong-Jeffries stated that she wanted to make sure that Jeffries was still agreeable, but then stated, "If [you] take my car . . . please be careful." Later, Haven texted to Fong-Jeffries that "[when] it comes to [T]ony his lu[c]k ends t[o]night. [You] hav[e] my word on that." Fong-Jeffries responded, "This definitely needs to come to an end. I also want [you] to be careful . . . I'm [seriously] mad[ ] enough to do [something] that could get me in trouble . . . ." Haven then responded, "I got this but [you] guys hav[e] to let me do it my way. This tryin[g] to b[e] his friend & help him shit ain[']t workin[g]." He then stated, "Hey we'll talk more [a]bout it [when] [you] get here ok. But [either] way it ends tonight." Fong-Jeffries replied, "[T]rust me I'm already knowin[g] . . . . I think that's all over now [though]. I think things have taken a sudden turn . . . ." Apparently realizing their text conversation implicated her in the plan, Fong-Jeffries then texted, "erase these messages please."

On March 28, 2012, the morning after Ortega was killed, Fong-Jeffries texted Haven and asked, "*Did everything go as planned[?]* I haven't been able to talk to [Jeffries] about anything yet . . . ." (Italics added.) Haven responded, "[you], [Jeffries] &

the kids [are] a [little] bit safer now.  The security system has been tightened up.  I told [you] [I]'d fix it feel me."

    These text messages demonstrate Fong-Jeffries shared the intent to kill Ortega, knew of the plan to kill Ortega, that the ongoing plan was concealed from Ortega, and that Jeffries and Haven had been attempting to carry out the plan, but were forced to continue to wait for an opportune time and favorable circumstances.

*Haven*, 2019 WL 4051881, at *23-24.

    The evidence, as thoroughly laid out by the Court of Appeal, was more than sufficient to establish the legal sufficiency of the lying-in-wait circumstance as to Fong.  Although it might have been possible to draw a different inference from the evidence presented by the defendants, this Court is required to resolve that conflict in favor of the prosecution.  *See Jackson*, 443 U.S. at 326.  Fong bears the burden of establishing by clear and convincing evidence that these factual findings were erroneous.  28 U.S.C. § 2254(e)(1).  She has failed to carry such burden.  The record does not compel the conclusion that no rational trier of fact could have found that Jeffries and Haven committed the murder by lying in wait and that Fong had the requisite intent to kill, especially considering the double deference owed under *Jackson* and AEDPA.  Fong is therefore not entitled to relief on this legal insufficiency claim.

B.    *Instructional Errors* (Grounds 2, 3, 5)

    Fong next argues that the trial court made a number of errors with respect to its instructions to the jury.  Because jury instructions in state trial are typically matters of state law, federal courts are bound by a state appellate court's determination that a jury instruction was not warranted under state law.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (noting that the Supreme Court has repeatedly held that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas

25

corpus."); *see also Williams v. Calderon*, 52 F.3d 1465, 1480-81 (9th Cir. 1995).  An

instructional error, therefore, "does not alone raise a ground cognizable in a federal habeas

proceeding." *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1986) (citation omitted).

A challenged instruction violates the federal constitution if there is a "reasonable

likelihood that the jury has applied the challenged instruction in a way that prevents the

consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380

(1990).  The question is whether the instruction, when read in the context of the jury charges as a

whole, is sufficiently erroneous to violate the Fourteenth Amendment.  *Francis v. Franklin*, 471

U.S. 307, 309 (1985).  This Court must also assume in the absence of evidence to the contrary

that the jury followed those instructions.  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000);

*Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the

law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the

subject in depth).

It is well-established that not only must the challenged instruction be erroneous but it

must violate some constitutional right, and it may not be judged in artificial isolation but must be

considered in the context of the instructions as a whole and the trial record.  *Estelle*, 502 U.S. at

72.  This Court must also bear in mind that the Supreme Court has admonished that the inquiry is

whether there is a reasonable likelihood that the jury applied the challenged instruction in a way

that violates the constitution and that the category of infractions that violate "fundamental

fairness" is very narrowly drawn.  *Id.* at 72-73.  "Beyond the specific guarantees enumerated in

the Bill of Rights, the Due Process clause has limited operation."  *Id*.  Where the defect is the

failure to give an instruction, the burden is even heavier because an omitted or incomplete

instruction is less likely to be prejudicial than an instruction that misstates the law.  *See*

*Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).

      1.    *Lying-in-wait special circumstance* (Ground 2)

Fong first argues that the trial court erred with respect to its instructions on the lying-in-

wait special circumstance.  Specifically, Fong avers that the given instructions allowed her to be

convicted of the lying-in-wait special circumstance without proof that she knew or intended the

murder to be committed by lying in wait.  But again, this argument relies on the faulty premise

that the jury was required to find that Fong intended the murder to be committed by lying in wait

rather than simply intend for the murder to be committed.  Because there was no such

requirement, Fong fails to show that the given instruction was erroneous or that she was

prejudiced by the instruction as given.  Fong's instructional error claim therefore also must fail.

      2.    *Uncharged conspiracy instruction* (Ground 3)

Fong additionally contends that the trial court erred in instructing the jury that the

defendants could be found guilty on a conspiracy theory of accomplice liability because

uncharged conspiracy is not a valid theory of accomplice liability.  According to Fong:

> The plain language of California Penal Code section 31 does not include uncharged conspiracy as a theory of accomplice liability.  Instead, California Penal Code section 182 describes conspiracy as a substantive crime.  Nothing within section 182 describes or defines conspiracy as a theory by which a defendant may be found guilty of a substantive offense other than the crime of conspiracy itself.

Docket No. 1 at 8.

But as the Court of Appeal noted in rejecting Fong's claim on direct appeal, the

California Supreme Court rejected the identical claim in *People v. Hajek and Vo*, 324 P.3d 88

(Cal. 2014), where the defendants challenged the use of uncharged conspiracy as a theory of

derivative liability where the defendants were not charged with the substantive offense of

conspiracy.  The Supreme Court held:

> Conspiracy can itself be the basis of derivative liability quite apart from aiding
> and abetting principles.  "It is long and firmly established that an uncharged conspiracy
> may properly be used to prove criminal liability for acts of a coconspirator.
> 'Failure to charge conspiracy as a separate offense does not preclude the People from proving that
> those substantive offenses which are charged were committed in furtherance of a criminal
> conspiracy [citation]; nor, it follows, does it preclude the giving of jury instructions based
> on a conspiracy theory [citations].' [Citation.]" . . . .[U]se of an uncharged conspiracy
> does not violate state law, even though the statutory definition of "principals" set forth in
> section 31 does not include conspirators.

*Id.* at 140 (citations omitted).

Again, this interpretation of state law is binding on this Court, *see Bradshaw*, 546 U.S. at

76, and forecloses federal habeas relief here.

       3.    *Accomplice testimony instructions* (Ground 5)

Fong further claims that the trial court violated her rights to testify and to present a

complete defense by giving jury instructions directing the jurors to view accomplice testimony

with caution.  According to Fong, because she testified in her own defense and was not called by

the People, the court's instruction improperly shifted the burden of proof because the instruction

as given required that the testimonial evidence presented in her case-in-chief had to be

corroborated and should be viewed with caution.  The Court of Appeal considered and rejected

this argument on direct appeal as follows:

> As the People observe, the California Supreme Court has expressly held that the
> former accomplice instruction from CALJIC, similar to the CALCRIM instruction set
> forth above, "is applicable regardless which party called the accomplice."  (*People v.
> Guiuan* (1998) 18 Cal.4th 558, 569 (*Guiuan*).)  Our high court subsequently clarified that,
> in the case of codefendants testifying in a joint trial, "there appears to be no persuasive
> reason not to require such an instruction when requested by a defendant in a case where
> the codefendant testifies."  (*People v. Box* (2000) 23 Cal.4th 1153, 1209, *disapproved on*

28

*another ground in People v. Martinez* (2010) 47 Cal.4th 911; *see also People v. Alvarez* (1996) 14 Cal.4th 155, 217-218 (*Alvarez*).) Moreover, there is precedent supporting the proposition that a trial court may be required to issue these instructions even in the absence of a request from one of the codefendants. (*See People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 105 (*Coffman and Marlow*).)

In *Coffman and Marlow*, two defendants charged with the same offenses each testified, and each defendant's testimony tended to incriminate the other. (*Coffman and Marlow*, *supra*, 34 Cal.4th at pp. 104-105.) The trial court, not based on a request by either of the codefendants, gave accomplice instructions similar to those at issue here, in a modified version of CALJIC No. 3.18. (*Coffman and Marlow*, at pp. 103-104 & fn. 34.) On appeal, the defendants argued that, because, under the circumstances, the instructions required the jury to view the testimony of one defendant tending to incriminate the other with distrust, while not requiring the jury to view with distrust testimony not tending to incriminate the other defendant, the instructions were essentially impossible to follow. (*Id.* at pp. 103-104.) They further claimed that these instructions undermined the presumption of innocence and deprived them of due process. (*Id.* at pp. 103-105.) The California Supreme Court rejected the defendants' contentions, stating, "Because the evidence abundantly supported an inference that each defendant acted as an accomplice to the other, and because each testified and, to some extent, sought to blame the other for the offenses, the court was required to instruct the jury that an accomplice-defendant's testimony should be viewed with distrust *to the extent it tended to incriminate the codefendant.*" (*Id.* at pp. 104-105, italics added, fn. omitted.) In support of its conclusion, our high court relied on both *Guiuan* and *Alvarez* (*Coffman and Marlow*, at pp. 104-105 & fn. 36), in the latter of which our high court held that the trial court has the authority to give such instruction when two codefendants testify on their own behalf, deny guilt, and incriminate each other (*Alvarez*, *supra*, 14 Cal.4th at pp. 217-218). In rejecting Fong-Jeffries's claims that the instructions improperly singled out her testimony, undermined her credibility, undermined the presumption of innocence, and deprived her of due process, we repeat our high court's observation: "'The testimony of a defendant ought not to be viewed without distrust simply because it is given by a defendant. Under the law, a defendant is surely equal to all other witnesses. But, under that same law, he [or she] is superior to none.'" (*Coffman and Marlow*, at p. 105, fn. omitted.)

For the reasons discussed in *Coffman and Marlow*, we reject Fong-Jeffries's claim that, while the instructions may properly state the law, they were "confusing and contradictory." Furthermore, when viewed as a whole (*see Houston*, *supra*, 54 Cal.4th at p. 1229), the instructions clearly directed the jurors that only statements or testimony of an accomplice "*that tend[ ] to incriminate the defendant* should be viewed with caution." (Italics added.) The instructions given here further provided that corroboration is required only when the statement of the accomplice is used to convict the defendant.

We also disagree with Fong-Jeffries's claim that the instructions given were partisan and argumentative. "'An instruction is argumentative when it recites facts drawn from the evidence in such a manner as to constitute argument to the jury in the guise of a

29

statement of law.  [Citation.]' [Citation.]  An argumentative instruction is '"an instruction 'of such a character as to invite the jury to draw inferences favorable to one of the parties from specified items of evidence.'"'"  (*Battle*, *supra*, 198 Cal.App.4th at p. 85.)  Here, the instructions were neither argumentative nor partisan.  CALCRIM Nos. 301 and 334 neutrally set forth the accomplice corroboration rule in a manner that did not favor either party, did not recite facts drawn from the evidence in a manner as to constitute argument, and did not invite the jury to draw inferences favorable to one of the parties based on specified evidence.

Fong-Jeffries claims that, under *Washington v. Texas* (1967) 388 U.S. 14 [18 L.Ed.2d 1019], the instructions at issue here violated her Sixth Amendment right to compulsory process.  However, the state statute invalidated in that case provided that persons charged as principals, accomplices, or accessories in the same crime could not be introduced as witnesses for each other.  (*Id.* at pp. 14-15.)  Such a procedure is clearly distinguishable from the instructions at issue here. CALCRIM Nos. 301 and 334 did not violate Fong-Jeffries's right to compulsory process.

Accordingly, we conclude that it was not error for the trial court to give these instructions.

*Haven*, 2019 WL 4051881, at *28-29.

Fong fails to show that the Court of Appeal's thorough, reasoned decision was unreasonable or contrary to federal law, much less clearly-established authority of the U.S. Supreme Court.  In particular, Fong does not demonstrate that the instruction "by itself so infected the entire trial that the resulting conviction violates due process."  *Estelle*, 502 U.S. at 72.  Rather, as the Court of Appeal stressed, the instruction limited itself to testimony by a given defendant that "tend[ed] to incriminate [a] codefendant," and jurors were further instructed to "separately consider the evidence as it applies to each defendant."  An independent review of the instructions in their entirety does not support that the jury would have interpreted the instruction in the manner she now suggests to heighten Fong's burden of proof or cause jurors to require corroboration of, or view with caution, testimony Fong gave in her case-in-chief as to her own defense.

Nor can it be said that clearly-established authority of the U.S. Supreme Court[4] requires that jury instructions treat testimony of defendants no differently than that of other witnesses. Lacking such clearly-established Supreme Court authority, it cannot be concluded that the appellate court's ruling contravened or unreasonably applied federal law. *Carey*, 549 U.S. at 77 (noting that, where the Supreme Court has not adequately addressed a claim, a federal court cannot find a state court ruling unreasonable). Fong is therefore not entitled to relief on any of these grounds.

C.      *Insufficient Corroboration of Accomplice Testimony* (Ground 4)

Fong additionally argues that there was insufficient evidence to corroborate Haven's testimony against her. Under California law, accomplice testimony must be sufficiently corroborated by other evidence to support a criminal conviction. CAL. PENAL CODE § 1111. Under California law, the test for determining whether sufficient corroborating evidence has been produced is:

> The evidence need not corroborate the accomplice as to every fact to which he testifies but is sufficient if it does not require interpretation and direction from the testimony of the accomplice yet tends to connect the defendant with the commission of the offense in such a way as reasonably may satisfy a jury that the accomplice is telling the truth; it must tend to implicate the defendant and therefore must relate to some act or fact which is an element of the crime but is not necessary that the corroborative evidence be sufficient in itself to establish every element of the offense charged.

*People v. Williams*, 161 Cal. Rptr. 830, 833 (Cal. Ct. App. 1980) (citation omitted).

---

[4]      As the Court of Appeal correctly concluded, *Washington v. Texas*, 388 U.S. 14 (1967), which invalidated a state statute mandating that persons charged as principals, accomplices, or accessories in the same crime could not be introduced as witnesses for each other, is clearly distinguishable and not applicable in this case, particularly given that Fong indeed testified in Haven's case. *See Haven*, 2019 WL 4051881, at *29.

Applying that test to the facts of Fong's case, the Court of Appeal determined on direct appeal that Haven's incriminating accomplice testimony was sufficiently corroborated, noting that Fong's "numerous text messages with Haven leading up to Ortega's murder do not merely *tend* to connect her to the murder, they *conclusively* connect her." *Haven*, 2019 WL 4051881, at *27.

Fong fares no better on federal habeas review. As Fong acknowledges, Docket No. 1 at 8 ("it is true that the United States Constitution does not require corroboration of accomplice testimony"), California's statutory law prohibiting convictions based solely on uncorroborated accomplice testimony is only a state law rule; it is not required by Constitution or federal law. *See Laboa v. Calderon*, 224 F.3d 972, 979 (9th Cir. 2000). The United States Supreme Court has held that "there is no absolute rule of law preventing convictions on the testimony of accomplices if juries believe them." *Caminetti v. United States*, 242 U.S. 470, 495 (1917); *see United States v. Necoechea*, 986 F.2d 1273, 1282 (9th Cir. 1993) ("The uncorroborated testimony of an accomplice is sufficient to sustain a conviction unless it is incredible or insubstantial on its face."). "When we look at the requirements of procedural due process, the use of accomplice testimony is not catalogued with constitutional restrictions." *United States v. Augenblick*, 393 U.S. 348, 352 (1969). Therefore, the requirement of California Penal Code § 1111 that "'a conviction cannot be had upon the testimony of an accomplice unless it be corroborated' is a matter of state law, which does not implicate a federal constitutional right" and cannot be the basis of federal habeas relief. *Barco v. Tilton*, 694 F. Supp. 2d 1122, 1136 (C.D. Cal. 2010).

Fong nonetheless argues that the decision of the Court of Appeal is contrary to federal law because "the United States Constitution . . . requires that the prosecution present constitutionally sufficient evidence to convict the defendant under the Fourteenth Amendment." Docket No. 1 at 8.  She therefore contends that "[t]he prosecution's failure to present constitutionally sufficient evidence to corroborate Haven's testimony against [Fong] violated [her] rights under the Fourteenth Amendment."  *Id*.  But such argument simply relies on the faulty premise that the U.S. Constitution requires such corroboration.  Fong does not show that Haven's incriminating testimony was either incredible or insubstantial.  Fong is therefore not entitled to relief on this claim.

D.      *Cumulative Error*(Ground 6)

Finally, Fong avers that the cumulative effect of the alleged errors enumerated above deprived her of a fair trial and warrants reversal of her conviction.  The Ninth Circuit has stated "[t]he Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting trial fundamentally unfair."  *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 298 (1973)); *see also Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000).  "Cumulative error applies where, although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors has still prejudiced a defendant." *Jackson v. Brown*, 513 F.3d 1057, 1085 (9th Cir. 2008) (quoting *Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000)).  Where "there are a number of errors at trial, 'a balkanized, issue-by-issue harmless error review' is far less effective than analyzing the overall effect of all the errors in the context of the evidence introduced at trial against the defendant."  *United States*

*v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (quoting *United States v. Wallace*, 848 F.2d 1464, 1476 (9th Cir. 1988)).

"While the combined effect of multiple errors may violate due process even when no single error amounts to a constitutional violation or requires reversal, habeas relief is warranted only where the errors infect a trial with unfairness." *Peyton v. Cullen*, 658 F.3d 890, 896-97 (9th Cir. 2011) (citing *Chambers*, 410 U.S. at 298, 302-03). Such "infection" occurs where the combined effect of the errors had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (citation omitted). In other words, where the combined effect of individually harmless errors renders a criminal defense "far less persuasive than it might [otherwise] have been," the resulting conviction violates due process. *See Chambers*, 410 U.S. at 294.

As discussed throughout this opinion, Fong does not demonstrate federal constitutional errors that would establish prejudice in the aggregate. *See, e.g.*, *Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011) ("Because we conclude that no error of constitutional magnitude occurred, no cumulative prejudice is possible."). Fong's cumulative error claim therefore must fail.

## V. CONCLUSION AND ORDER

Fong is not entitled to relief on any ground raised in her Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability. *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree

with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: January 25, 2021.

    /s/James K. Singleton, Jr.    

JAMES K. SINGLETON, JR.

Senior United States District Judge
